UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-81553-CIV-ALTONAGA/MCALILEY

LUKNER BLANC,

     Petitioner,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## SECOND REPORT AND RECOMMENDATION ON
## MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

Petitioner Lukner Blanc ("Blanc") filed a Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255 ("the Motion"), (ECF No. 1), and a Memorandum of Law in Support of his Motion, (ECF No. 1-1). After that Motion was fully briefed, the Honorable Cecilia Altonaga referred the Motion to me, (ECF No. 17), and I thereafter issued a Report and Recommendation that recommended that the Court find that all of Blanc's eight claims of ineffective assistance of counsel are without merit. (ECF No. 18). Judge Altonaga agreed that Blanc is not entitled to relief on seven of his claims but concluded that one claim - that his trial counsel was ineffective for failing to investigate a juror - warrants an evidentiary hearing, and she referred the matter back to me. (ECF No. 22). The parties submitted additional memoranda of law (ECF No. 31, 32) and on February 25, 2020, I held an evidentiary hearing. (ECF No. 34).[1] For the reasons that follow, I

_____

[1] The transcript of that hearing is filed at ECF No. 44, and is cited here as Tr. at ___.

1

conclude that Blanc has not shown that his trial counsel failed to provide him with the effective assistance of counsel.

## I.      Petitioner's Claim

Blanc had a trial by jury and on April 8, 2015 the jury found Blanc guilty of all charges. (CR-ECF No. 248).[2] Richard Serafini was Blanc's appointed counsel at trial. Several months later, on July 23, 2015, Blanc wrote the trial Judge, the Honorable Daniel T. K. Hurley, with a list of reasons why he felt Mr. Serafini was ineffective – with no mention of the issue addressed here – and asked the Court to replace Mr. Serafini with a new attorney. (CR-ECF No. 282). Judge Hurley granted that motion on July 29, 2015, and appointed Richard Rosenbaum, who represented Blanc at sentencing (on January 4, 2016) and on appeal. (CR-ECF No. 283). So, Mr. Serafini was Blanc's trial counsel, although Mr. Rosenbaum represented Blanc at the trial level in the five months that led up to sentencing.

Blanc is currently serving a lengthy sentence imposed by Judge Hurley. The Eleventh Circuit Court of Appeals affirmed Blanc's conviction and sentence on direct appeal. (CR-ECF No. 394). As noted, Blanc thereafter filed a motion, pursuant to 28 U.S.C. §2255, that asks the Court to vacate his conviction and sentence because his trial attorney did not provide him the effective assistance of counsel as mandated by the Sixth Amendment to the United States Constitution. (ECF No. 1).

Blanc's claim now before the Court is that his trial counsel (whom he did not

---

[2] Docket entries in Blanc's criminal case, 14-80114-CMA, are cited as "CR-ECF No. __."

specify) was ineffective, post-trial, for failing to investigate potential bias on the part of juror number twenty, Ms. Shelia Harvey Lawrence. (ECF No. 1-1 at 21; ECF No. 16 at 8-9; ECF No. 31, at 2). In particular, Blanc claims that had trial counsel investigated Ms. Harvey Lawrence post-trial, he would have established that she "was not truthful during *voir dire* about how (and how well) she knew Petitioner" and that this would have allowed trial counsel to successfully move for a new trial. (ECF No. 31, at 2). The entire *voir dire* colloquy with Ms. Harvey Lawrence was as follows:

> **The Court:** Ma'am, what is your first name?
>
> **Juror Twenty**: Sheila.
>
> **The Court**: Sheila.
>
> **Juror Twenty**: Harvey Lawrence.
>
> **The Court**: They have you here as Lawrence Harvey, so that's why I was asking.
>
> **Juror Twenty**: (Inaud.)
>
> **The Court**: Do you use both last names?
>
> **Juror Twenty**: Yes.
>
> **The Court**: Good, good. Ms. Lawrence Harvey, would you tell us about yourself.[3]
>
> **Juror Twenty**: I live in Wellington. I'm a doctoral student at NOVA Southeastern University. I work. I'm an assistant principal with the school district and Department of Juvenile Justice residential program. I've never served on a jury before. I've been called but not served. I'm married. My husband works in the sugar refinery in western part of the county. I have

---

[3] The Court gave potential jurors a list of questions which they were instructed to answer when called upon. (CR-ECF No. ___).

three grown children. And one, I have a daughter who is a reading coach with the school district. A son who is working his own business, mobile detailing. And a college student. *I'm not sure if I know one of the defendants. The name I know but not the face, so.*

**The Court**: *One of the defendants in the case or one of the witnesses?*

**Juror Twenty**: *The defendant.*

**The Court**: *And who is it you think you might know? Mr. Blanc?*

**Juror Twenty**: *Mr. Le Blanc. I'm thinking I know the name.*

**The Court***: It's not Le Blanc, though. It's just B-L-A-N-C.*

**Juror Twenty**: *Okay. I think I may know him, not personally, but from where I was from previously.*

**The Court**: *All right.*

**Juror Twenty**: *Growing up with the kids and all.*

**The Court**: *Where was it that you grew up, ma'am?*

**Juror Twenty**: *In Belle Glade.*

**The Court**: *Out in Belle Glade?*

**Juror Twenty**: *Yes.*

**The Court**: *Okay. Can I ask you, would that in any way, do you think, affect your ability to evaluate the evidence in this kind of case?*

**Juror Twenty**: *No. No, it wouldn't.* I have a niece who is deputy with the sheriff's department.

**The Court**: And how about her job? Would that in any way affect your judgment there do you feel?

**Juror Twenty**: No, it wouldn't. No government agency. No one employed. I know someone—some people who have been arrested and charged with crimes.

4

**The Court**: How about their situations? In the way they were treated or how the case was handled, anything about that, would that affect your judgment?

**Juror Twenty**: No, it wouldn't. Victim of a crime. My mom had her bank—they compromised her checking account.

**The Court**: They got into the checking account.

**Juror Twenty**:  Yes, yes. And that was resolved through the bank.

**The Court**: That was all taken care of?

**Juror Twenty**: Yes.

**The Court**: Would that in any way affect your judgment in the case do you think?

**Juror Twenty**: No. No allegation of wire fraud. I'm thinking I know of a case with fraud, but I'm not sure. I wasn't really involved in the case so I'm not sure.

**The Court**: Would that affect you at all do you feel?

**Juror Twenty**: No. I accept the law as explained. I do believe in the jury system. I can be impartial. And there's nothing else I would like to mention.

**The Court**: Well, thank you so much.

(*Id.* at 100-02) (emphasis supplied).

Blanc wrote in his motion that he did not recognize juror twenty during jury selection, nor during trial. (ECF No. 1-1 at 19-20). On the last day of trial, however, a friend, Franchette Mila, attended the trial and several days after the trial was over, she told Blanc that the Juror knew him under unfavorable circumstances.  (*Id.*). Blanc asserts that he told his attorney of this, but his attorney "did not take any steps to confirm that the Petitioner received a fair (or unfair) trial. Trial counsel did not alert the Court about the

5

issue or move for a new trial on that basis." (*Id.* at 20-21). Blanc claims that "[h]ad trial counsel inquired further, and brought this information to the court's attention at an appropriate and timely proceeding, prior to his appeal, the Petitioner would have been given a new trial." (*Id.* at 21). Blanc claims that his lawyer was ineffective for failing to investigate the Juror and her associations with Blanc, and to move for a new trial, which Blanc claims the Court would have granted.

## II.  Evidentiary hearing

Five witnesses testified at the evidentiary hearing: Mr. Blanc, Ms. Shelia Harvey Lawrence, Franchette and Jean Claude Mila (friends of Blanc) and Richard Serafini, Esq. I recount their pertinent testimony.

### A.  Lukner Blanc

Blanc, who was from Belle Glade, told Mr. Serafini that he did not want anyone from Belle Glade on the jury. (Tr. at 11, 42). Blanc describes Belle Glade as small town, where "everybody knows everybody else's business."  Blanc feared its residents would be biased against him. (*Id.*). Blanc was known in Belle Glades by the nickname Luke. (*Id.* at 30).

As it turns out, juror number twenty, Ms. Harvey Lawrence, had lived in Belle Glade for many years, although she moved to Wellington years before Blanc's trial. Blanc did not recognize Ms. Harvey Lawrence at any time during trial. (*Id.* at 12-13, 41). Blanc testified that he was concerned when she disclosed that she had lived in Belle Glade, but since she was by then a resident of Wellington, Blanc was not opposed to her being on the

jury. (*Id.* at 13, 42).[4]

On the last day of the trial, Franchette Mila came to observe the trial and she recognized Ms. Harvey Lawrence as the mother of Edward Shine – someone Blanc described as his enemy - and Ms. Mila told Blanc this a few days after the trial was over. (*Id.* at 14-17). Blanc believes that at the time of jury selection and throughout trial Ms. Harvey Lawrence must have known who Blanc was, and must have known of a variety of negative encounters Blanc had with her and her family, and therefore must have been biased against him. (*Id.* at 44).

### 1.  Blanc's encounters with the Juror's family

Blanc testified that when he lived in Belle Glade there were rivalries, including shootings, between the Haitian and "American" communities in Belle Glade. Blanc, and his close friend Jean Mila (Franchette's husband) were in the Haitian section, and Edward Shine was in the American. (*Id.* at 23). Blanc explained that between 2010 and 2012, he and Edward Shine were in conflict. (*Id.* at 38).  In 2012, Shine shot at Blanc's car, when Blanc was driving. (*Id.* at 46). Blanc called the police, identified Shine as the shooter, and a police report was prepared. (*Id.* at 21-23, 46).

Also, around that time, Jean Mila was tried on charges of shooting Shine, and Blanc attended that trial. Shine evidently became upset when he saw Blanc in the audience, and Blanc had to leave the courtroom. (*Id.* at 23-25).

---

[4] Later, on cross-examination, Blanc testified that during jury selection Ms. Harvey Lawrence looked at Blanc and laughed at him, and Blanc told Mr. Sarafini that he did not like that juror. (*Id.* at 25).

About a decade earlier, Blanc worked with the Juror's husband, who ran a crew that picked corn. Blanc was maybe 19, 20 or 21 years old at the time, and he testified that during that time he encountered Ms. Harvey Lawrence, who did paperwork for her husband. (*Id.* at 25-26).

Also, in or around 2002, when Blanc was 20 years old, he spent time with a young woman, Sandy Joseph, who lived across the street from the Lawrence residence. At that time Ms. Harvey Lawrence's niece, Lisa Davis, lived at her home. On one occasion Blanc and a friend of his, who was driving, picked up Lisa and Sandy from school. Blanc assumes the school notified Ms. Harvey Lawrence and that she called her husband. When the car with the four youths was stopped at a red light, Mr. Harvey Lawrence pulled up his truck up behind them, walked to the car and angrily opened the door, and Blanc, who was seated in the front passenger seat, got out and ran, chased by Mr. Harvey Lawrence. Mr. Harvey Lawrence recognized Blanc from their work in the fields. Sandy later called Blanc to say that at the insistence of Ms. Harvey Lawrence, she and Lisa were at the hospital, evidently to determine whether they had had sex, and that Ms. Harvey Lawrence had called the police to the hospital.  (*Id.* at 27-29, 32-33, 38, 40).

### 2.  Blanc's post-trial discussion with counsel

A few days after the trial ended, Blanc and Serafini met, and Blanc told Serafini about this history and asked him to investigate the Juror. According to Blanc, he met with Serafini maybe four or five times after the trial, and Serafini took no steps to try to corroborate what Blanc told him. (*Id.* at 18-19, 31).

When Mr. Rosenbaum became his lawyer, Blanc raised this issue with him, but

Rosenbaum said that he was appointed just for sentencing and appeal, and that any investigation of juror misconduct fell outside his authority. (*Id.* at 19-20).

Blanc said he gave both attorneys phone numbers for Sandy Joseph and Franchette Mila, along with the number of an investigator, named Ralph, who agreed to help Blanc. (*Id.* at 21, 30, 41). Serafini never told Blanc of his calls to Sandy Joseph and Franchette Mila. (*Id.* at 39). Blanc also testified that Serafini did not tell him that Serafini tasked an investigator with searching for police reports that would corroborate Blanc's recollection of the 2002 incident involving Sandy Joseph and Lisa Davis. (*Id.* at 33). He also denied that Serafini informed him that Serafini had ordered the transcript of jury selection. When shown a July 14, 2015 letter from Serafini to Blanc, that said just that, Blanc responded that he did not read the letter. (*Id.* at 34-37).

### B.    Richard Serafini

Serafini testified that both he and Blanc took notes during the jury selection process and shared their impressions of jurors. Serafini did not recall Blanc saying that he did not want anyone from Belle Glade on the jury.  Regarding Ms. Harvey Lawrence, Mr. Serafini thought she should not be on the jury. Blanc had pending state charges and Serafini was concerned that Ms. Harvey Lawrence, who thought she recognized Blanc, might have heard of those charges. Initially Blanc agreed that Ms. Harvey Lawrence should not be on

the jury, but Serafini was surprised that, in the end, Blanc wanted her as a juror. (*Id.* at 104-08, 126-28).

Serafini met with Blanc a number of times after the trial.[5] The two met first on April 13, 2005, which was when Blanc first told Serafini about his conversation with Franchette Mila, and that Blanc had a bad relationship with Ms. Harvey Lawrence's foster son, Edward Shine, to include their shooting at each other in 2010, and a shooting between Shine and Blanc's close friend, Jean Mila. (*Id.* at 110-11). Serafini and Blanc next met on April 30, 2015 which was when Blanc told his lawyer about the incident with Sandy Joseph and Lisa Davis, and his belief that Ms. Harvey Lawrence accused Blanc of abducting and possibly raping them. Blanc thought there would be a police report of this incident. Blanc gave Serafini telephone numbers for Sandy Joseph and Franchette Mila.  (*Id.* at 111-12).

Blanc and Serafini met again May 6, 2015, with a probation officer who was preparing the Presentence Report. Later that afternoon Serafini called both Franchette Mila and Sandy Joseph. Ms. Mila was not particularly helpful; she said that her husband and Edward Shine had a bad relationship, but she did not confirm that there was a problem between Shine and Blanc. Ms. Mila also could not identify any problem between Ms. Harvey Lawrence and Blanc.

Sandy Joseph was more helpful. She confirmed that Ms. Harvey Lawrence lived across the street from her, and that at the time Sandy was seeing Blanc, Ms. Harvey

---

[5] At the evidentiary hearing, Serafini had with him notes of six post-trial meetings, which he reviewed before he testified, and which he produced to counsel for both parties. (*Id.* at 32, 109).

Lawrence's foster daughter, Lisa Davis lived there too. Ms. Joseph recalled the incident when Blanc and his friend picked up both girls in a car. She recalled that Ms. Harvey Lawrence was upset with Blanc and had called the police. Sandy Joseph said she would be willing to sign an affidavit to that effect, but when Serafini followed up with her on several occasions, Ms. Joseph did not respond. (*Id.* at 112-15, 128, 132).

Serafini and Blanc met again on May 19, 2015, when Serafini told Blanc that he had tasked their trial investigator, Mark Murnan, with searching for any police reports that reference the incident with Sandy Joseph and Lisa Davis. (*Id.* at 115-16). On May 27, 2015, the investigator gave Serafini a report of his search for any police reports of complaints by Ms. Harvey Lawrence, that came up empty. (*Id.* at 116-18).[6] Serafini asked Murnan if he would do a similar search regarding Edward Shine and Blanc, but Murnan declined because no investigative funding remained.

When Serafini met with Blanc next, on July 2, 2015, Serafini discussed how he might bring this issue to the Court. Serafini told Blanc that he would order the transcript of the *voir dire*, which Serafini did, and that he hoped to get an affidavit from Sandy Joseph, after which he would either move for a new trial, or perhaps move first, *ex parte*, for additional CJA funding for the investigator. (*Id.* at 117-21, 123, 130). On July 14, 2015 Serafini wrote Blanc, sending documents Blanc had requested, and notified him that he had ordered the *voir dire* transcript and would send it to Blanc upon arrival. (*Id.* at 121-22).

---

[6] It may be that police department records only went back to around December 2006. (*Id.* at 41, 129).

Serafini and Blanc's last meeting was on July 25, 2015, when they discussed issues on appeal. Serafini was still waiting for the *voir dire* transcript. Days earlier Blanc had written the Court to ask for a new attorney, although that letter had not yet been docketed. Blanc did not tell Serafini that he made this request, nor did he tell Serafini that he was dissatisfied with his services. (*Id.* at 123). A few days later, Mr. Serafini was terminated as counsel for Blanc, and as a result, he did not present the Court with the issue of juror bias. Serafini contacted Richard Rosenbaum and made him aware of the concern about the Juror, and information he had. (*Id.* at 124-25, 131).

### C.  Franchette Mila

Ms. Mila testified that she had known Blanc for more than 20 years, since they attended high school together. (*Id.* at 86). Her husband is Jean Mila and his conflicts with Edward Shine were well-known in Belle Glade, which is a small, close-knit community. (*Id.* at 87). Ms. Mila confirmed that she attended Blanc's trial and she recognized one of the jurors as Edward Shine's mom, which she thought would present a conflict of interest. (*Id.* at 88). She spoke with Serafini after the trial but cannot recall well what she said to him.  She did not recall being reluctant to speak with him. (*Id.* at 90-91).

### D.     Jean Mila

Mr. Mila described Blanc as his best friend. They grew up together in Belle Glade. Mila also grew up with Edward Shine, who he described as his enemy. (*Id.* at 93-94, 100). Their conflicts took place about ten years prior. (*Id.* at 101). In 2011 Mila was charged with the attempted first-degree murder of Edward Shine; Mila went to trial and was acquitted. Blanc attended that trial but had to leave when Shine made accusations against him. Mila

12

said Blanc also had issues with Shine. (*Id.* at 94-95). Edward Shine was suspected in the murder of Mila's brother, and the newspaper reported an incident when Shine and Mila shot at each other. (*Id.* at 98).

Mr. Mila knows Ms. Harvey Lawrence from Belle Glade, not personally, but from seeing her in the community, and for a time he was a college roommate with her oldest biological son. Ms. Harvey Lawrence had a house on Main Street in Belle Glade, and it was known that she raised foster children there. (*Id.* at 96-98). Mr. Mila said that there is another man in Belle Glade named Luke who was about the same age, who is a friend of Edward Shine. (*Id.* at 98-99).

### E.      Shelia Harvey Lawrence

For twenty-one years Ms. Harvey Lawrence has been employed by the Palm Beach County School District as an Assistant Principal at a juvenile correctional facility. (*Id.* at 49, 59). She has lived in Wellington, Florida for the past ten years. Before that she lived in Belle Glade, other than a few years when she lived in nearby South Bay. (*Id.* at 49). She was married at age 21 and her husband has always worked as a farmworker with different crops. When her husband worked in corn, Ms. Harvey Lawrence worked with him, but then she returned to school to become an educator. (*Id.* at 54).

Ms. Harvey Lawrence has four biological children and she is in the process of adopting a one-and-a-half-year-old child. Starting around age 28, she began to help raise other children. She took in four children whose mother was not well, and later, when her own mother - who lived nearby - took in Ms. Harvey Lawrence's nephew and two nieces, she helped her mom raise them. Edward Shine was one of the four children she took in,

and he lived with Ms. Harvey Lawrence from about age 10 to 16 or 17. (*Id*. at 50-52, 58). She has not had much contact with Shine since he moved out, although he has stopped by very occasionally to say hello. Ms. Harvey Lawrence did hear that Shine went to trial on criminal charges, and she heard that he had been shot in the foot or leg, although she did not know the details about either event. Ms. Harvey Lawrence did not read any newspaper articles about Shine, and Shine did not share his criminal troubles with her. (*Id*. at 55-59).

Alecia, who was called Lisa, was one of the nieces she helped raise. (*Id*. at 52, 59). Ms. Harvey Lawrence recalled that Lisa was friends with a girl who lived across the street named Sandy Joseph. She also recalled an incident when some boys picked up Sandy and Lisa from school. Ms. Harvey Lawrence remembers being in a car, possibly with her husband, and that one of the boys got out and ran but she denied that her husband ran after that boy. She did not remember filing a police report, or taking the girls to a hospital. Ms. Harvey Lawrence had forgotten about this until the attorneys for both parties met with her shortly before the evidentiary hearing and asked her about this. She did recall that one of the boys was named Luke, although there was another Haitian male in Belle Glade with that name. Notably, at the evidentiary hearing Ms. Harvey Lawrence did not identify Blanc as one of the young men in that car.  (*Id.* at 59-64, 73, 80).

Ms. Harvey Lawrence remembered Blanc's name as someone who worked with her sons in the corn fields, and when she told Judge Hurley that she might know him, it was in that context; she did not know him personally.  Blanc may, or may not, have worked on her husband's crew when he worked in the fields. At one time Ms. Harvey Lawrence

worked as a bookkeeper for her husband, but not when Blanc worked in the fields. (*Id.* at 61-64, 66-67).

Ms. Harvey Lawrence testified that when she was called to jury duty in 2015, she did not want to serve. (*Id.* at 64).[7] She was (and still is) caring for her mother, now 81 years old, who has suffered from dementia for the past eight years, and she did not have anyone to stay with her. (*Id.* at 58, 64). But she accepted that she was "doing my duty as a citizen to serve…." (*Id.* at 65). She remembers being given a questionnaire to answer during jury selection, but when she was asked if she recalled how she answered Judge Hurley's questions, she did not.[8] (*Id.* at 65-67). When asked how she recognized Blanc at the time of the trial she said "…I want to say - - I kind of knew his face. I knew his face. The name - - not the last - - just Luke. I knew the face with Luke." (*Id.* at 67; *see also* 74-75). At no point during the trial did Ms. Harvey Lawrence realize that she knew Blanc beyond what she told the Court. (*Id.* at 72-73). She denied looking at him and laughing, saying "That's not me." (*Id.* at 81).

The questionnaire asked if she had children and she answered that she had four. At the evidentiary hearing Ms. Harvey Lawrence was asked why she did not mention the other children she cared for, and she explained that she thought the question was directed at her

---

[7] Ms. Harvey Lawrence testified: "[I]f I could have honestly said I know him and don't like him and got off the jury, you know, that probably would have been it. But that's not the person I am. You know, I was called and I had to be honest….But because I felt like I had an inkling of who he were, I felt compelled to mention that to make sure that they knew that I knew him." (*Id.* at 80).

[8] Counsel for both the government and Blanc went to see Ms. Harvey Lawrence in advance of the evidentiary hearing to question her about the issues raised in the Motion. They did not show Ms. Harvey Lawrence a transcript of the jury selection. (*Id.* at 153-54).

biological children, not other children who she cared for but did not adopt. (*Id*. at 68-69,

83). Ms. Harvey Lawrence explained that generally, when she's asked how many children

she has, she responds that she has "four, but I say I raised a lot more." (*Id*. at 69).  She also

testified that she calls all of them her kids, because she helped raise them. (*Id*. at 55).

Ms. Harvey Lawrence described Belle Glade as a small town but did not agree that

everyone knows everyone else. Once she had children she was separated "from the in-

crowd of Belle Glade". Her son attended high school at Palm Beach Central and was bused

about 20 miles to school. (*Id*. at 53-54). She was not aware of violence when she lived in

Belle Glade, she thinks that began after she moved to Wellington. (*Id*. at 55). And, she

thought that any rivalry between the Haitian and American communities must have

happened after she left Belle Glade. (*Id*. at 68). Knowing that Edward Shine worked in the

fields around the same time as Blanc, she would have guessed that they might have been

friendly. (*Id*. at 70). She did not know there was friction between them. (*Id.* 83). She did

not know Jean Mila and did not know that he had been accused of shooting Edward Shine

in the foot or leg. (*Id*. at 71-72).

When asked if, hypothetically, she had known that Blanc shot at Edward Shine,

would she hold that against him, she answered as follows:

> I work with kids every day that commit crimes, and my job is to help them
> to become better people than they were….I work at the Palm Beach County
> Jail where they direct file kids. And when they come in and …they're in there
> for a murder charge, I just think I know people make mistakes. But it's not
> my job to hold that against them for the people who they are. Because I do
> feel that everybody has …good in them. You know, so no. Especially when
> I - - if I'm being charged with having somebody's life in my hands - - I live
> by and teach you get to know people for yourself, not from someone else.
> Even if Mr. Blanc and Mr. - - and Edward Shine had some dealings or

something going on, to me that would have been between the two of them and they would have to work that out. If I could do anything to help them work it out, that's how I would have done that. But not penalize him for something they were going through when I was charged with looking into something else.

(*Id.* at 82-83). Ms. Harvey Lawrence confirmed that had she known of the problems between Blanc and Shine she would have said so during jury selection. (*Id.* at 82).

Ms. Harvey Lawrence believes she was a fair juror. In fact, she was the only juror who held out on finding him guilty on the conspiracy charge; other jurors had to persuade her of his guilt.  (*Id.* at 75-77). She explained: "I had to live with my decision, and I didn't want it to be that - - you know … I didn't want to have him pay for something that was going on when he was actually locked up. So that's the conversation they had to have with me in the jury room in order for me to come to my conclusion." (*Id.* at 76). Ms. Harvey Lawrence did not associate Blanc with the incident with her niece and Sandy Joseph, in fact, she thought that incident might have involved the other Luke who lived in Belle Glade. (*Id.* at 78). Regarding that incident she stated: "I didn't put much thought into it to be honest with you. Because like I explained to you all earlier, kids are kids and . . . kids do things. But I'm not one to believe that you hold it - - hold them to that as adults." (*Id.*). She did not hold any bias against Blanc, at the time of the trial, or now. And she answered the judge's questions honestly. (*Id.* at 78-79).

### III.    Analysis

Blanc claims that Ms. Harvey Lawrence "was not truthful during *voir dire* about how (and how well) she knew" him and that had she been truthful it would have provided "cause to challenge her as a juror." (ECF No. 31 at 2).  He further argues that his trial

counsel was ineffective for failing to investigate this, post-trial, and move for a new trial. (*Id.*)

### A.    The *Strickland* Standard for Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, Blanc must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He must show that: (1) his counsel's performance was deficient because it "fell below an objective standard of reasonableness" and (2) deficient performance prejudiced his defense. *Id*. at 687-88.

As for the first prong, Blanc must prove by a preponderance of the evidence that his attorney's performance was unreasonable. *Streeter v. United States*, 335 F. App'x 859, 863 (11th Cir. 2009) (citation omitted). That burden "is a heavy one," *Fugate v. Head*, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted), and "judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689. "In order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Fugate*, 261 F.3d at 1217 (quotation marks and citation omitted). Courts must apply a "strong presumption" that an attorney's conduct falls within a "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Criticisms which "amount to second guesses of the attorney's judgments and tactical decisions" are "not the stuff of a sixth amendment claim." *Jones v. Kemp*, 678 F.2d 929, 932 (11th Cir. 1982) (citations omitted).

As for the prejudice prong, Blanc "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard is demanding, and Blanc must

demonstrate that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

The Court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. For the reasons that follow, I find that Blanc has failed to establish the prejudice prong of *Strickland*, and that for this reason, the Court should deny his Motion.

### B.    Legal Standard for New Trial Due to Juror Falsehood

The standard for a new trial, where a juror gave an inaccurate response to a *voir dire* question, is proof that: (1) the juror failed to honestly answer a material question during *voir dire*; and (2) a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984).

The first prong is met when the court finds that the juror "was aware of the fact that [her] answers were false." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992) (quoting *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984)). The second prong requires a showing of actual bias. *Id.* (citing *Perkins*, at 1532; *United States v. Casamayor*, 837 F.2d 1509, 1515 (11th Cir. 1988)). Actual bias can be established by "express admission" or through "specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *Perkins*, 748 F.2d

1519, 1532 (11th Cir. 1984) (citing *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).

As explained below, the evidence does not show that Ms. Harvey Lawrence failed to honestly answer a material question during *voir dire*, or that she had an actual bias against Blanc. There is no reason to believe that a full investigation of Ms. Harvey Lawrence following trial would have shown that she lied during jury selection, or that she was actually prejudiced against Blanc, or that it would have led to a new trial. This being so, Blanc has failed to satisfy *Strickland's* prejudice requirement. He has not shown that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 1.     Blanc Did Not Show That Ms. Harvey Lawrence Failed to Honestly Answer a Material Question

The premise of Blanc's belief that Ms. Harvey Lawrence deceived the Court during jury selection, and deliberately failed to reveal the associations Blanc had with her family, is that Ms. Harvey Lawrence knew of those associations, and that she remembered them when she was called to jury service. Underlying this belief are assumptions that Blanc's memories are accurate, that Ms. Harvey Lawrence remembered what Blanc remembers, and to the extent she recalled events differently, that her memories are inaccurate.[9] I address each of her statements in turn.

---

[9] Neuroscience has debunked the public perception that memory "is akin to a video recorder" and has shown instead, that "memory is a reconstructive process that is susceptible to distortion." Joyce W. Lacy and Craig E. L. Stark, *The Neuroscience of Memory: Implications for the Courtroom*, Aug. 14, 2013, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4183265/

### a.      Ms. Harvey Lawrence Gave Truthful Answers During *Voir Dire*

Ms. Harvey Lawrence testified, very credibly and persuasively, that she honestly answered the Court's questions during *voir dire*. These are the pertinent statements she made in March of 2015:

> **Juror Twenty**: *I'm not sure if I know one of the defendants. The name I know but not the face, so.*
>
> **The Court**: *One of the defendants in the case or one of the witnesses?*
>
> **Juror Twenty**: *The defendant.*
>
> **The Court**: *And who is it you think you might know? Mr. Blanc?*
>
> **Juror Twenty**: *Mr. Le Blanc. I'm thinking I know the name.*
>
> **The Court**: *It's not Le Blanc, though. It's just B-L-A-N-C.*
>
> **Juror Twenty**: *Okay. I think I may know him, not personally, but from where I was from previously.*
>
> **The Court**: *All right.*
>
> * * *
>
> **Juror Twenty**: *I do believe in the jury system. I can be impartial.*

(CR-ECF No. at 100-02).

First, Ms. Harvey Lawrence stated, under oath, that although she was "*not sure*", she might know Blanc although "*not personally*." She said she thought she knew his name, which she incorrectly thought was "*Le Blanc*". Five years later, at the recent evidentiary hearing, Ms. Harvey Lawrence was asked if she remembered how she answered Judge Hurley's questions during jury selection. Not surprisingly, she did not. (Tr. at 65-67). Appropriately, counsel did not refresh her recollection before the hearing by showing her

the transcript of her statements. (Tr. at 153-54). When she was asked at the hearing how she recognized Blanc at the time of the trial she answered "…I want to say - - I kind of knew his face. I knew his face. The name - - not the last - - just Luke. I knew the face with Luke." (*Id.* at 67; *see also* 74-75).

Blanc's counsel argued at the close of the hearing that Ms. Harvey Lawrence's answer that she "knew his face" was evidence that her statement in 2015 -- "*the name I know but not the face*" – was dishonest.  I cannot agree. What was important about her statements to Judge Hurley, was that she might know the defendant. She made it clear that she did not have a personal connection with him, but thought she had encountered him in Belle Glade, where she had lived years prior.  It was not material whether, in 2015, she recognized Blanc's face or name; what was material was her disclosure that she thought she knew him in some regard.

Notably, even after Ms. Harvey Lawrence told the Court, during jury selection, that she might know Blanc, he did not recognize her at all. This is entirely consistent with her having had but a dim memory of him.

Next, Ms. Harvey Lawrence testified that she thought she knew Blanc from "*growing up with the kids and all*". Ms. Harvey Lawrence's testimony at the hearing was entirely consistent with this answer. She explained that she associated Blanc as one of the "kids" who worked in the fields along with her sons. Blanc, of course, testified that when he was around 19, 20 or 21 years old, he did work in the fields. And he thought he saw Ms. Harvey Lawrence do paperwork for her husband, although she did not think she did so at that time. I thought her recollection of that association was credible.

22

Last, Ms. Harvey Lawrence told Judge Hurley that her recognition of Blanc would not "*affect* [her] *ability to evaluate the evidence in this kind of case.* She also added "*I do believe in the jury system. I can be impartial.*" Her statements then, are consistent with her recent testimony.

Ms. Harvey Lawrence credibly conveyed a strong sense of fairness, open-mindedness and civic duty. She has devoted her life to helping the most vulnerable, by taking children into her home and caring for them as if they were her own (even now, adopting a toddler), caring for her elderly mother who suffers from dementia, and more than two decades of educating and supporting incarcerated children accused of serious crimes. In doing so, she has sacrificed her comfort and convenience. Her testimony that she felt she was "doing my duty as a citizen to serve…." (Tr. at 65) when she was selected for the jury, was credible, even when she did not want to serve because she was caring for her mother.

Ms. Harvey Lawrence plainly is capable of impartiality. She has chosen to work with incarcerated youth and explained: "I just think I know people make mistakes. But it's not my job to hold that against them for the people who they are. Because I do feel that everybody has …good in them. You know, so no. Especially when I - - if I'm being charged with having somebody's life in my hands - - I live by and teach you get to know people for yourself, not from someone else." (Tr. at 82-83). Plenty of people would not offer such an opinion, but she did so with conviction, and it is entirely consistent with some of her life choices. Ms. Harvey Lawrence's statement to Judge Hurley "*I do believe in the jury system. I can be impartial*" was consistent with her testimony in my courtroom.

23

Blanc testified that during jury selection Ms. Harvey Lawrence looked at him and laughed. She denied that she did so, saying "That's not me." Again, this impressed me as credible. Ms. Harvey Lawrence spoke to the Court with respect during jury selection, and she did the same before me. The notion that she would have laughed at a defendant in the courtroom during the solemnity of jury selection is inconsistent the behavior and testimony I read and observed. I also note that, as explained below, Blanc's recollection and credibility regarding the actions of Serafini were shown to be poor. I do not credit Blanc's testimony that Mr. Harvey Lawrence laughed at him during jury selection.

In sum, I see no evidence Ms. Harvey Lawrence gave a false answer to any question during jury selection.

### b. Ms. Harvey Lawrence Did Not Omit Material Information During *Voir Dire*

Blanc argues that Ms. Harvey Lawrence omitted material information. That is, she deliberately did not tell Judge Hurley about her niece, Lisa Davis', encounter with Blanc, his friend and Sandy Joseph in 2002 and, around the same time, that she worked with her husband and saw Blanc then when he worked in the fields. Plus, she neglected to tell the Court that about a decade later, her foster son, Edward Shine, and Blanc were enemies, and shot at each other.

As for the later events – the enmity and gunfire between Blanc and Shine – this took place after Ms. Harvey Lawrence moved to Wellington and well after Edward Shine had left her home. Because they were more recent in time to her jury service, and dramatic, I can understand Blanc's assumption that Ms. Harvey Lawrence would have had these events

in mind when called to jury duty. Ms. Harvey Lawrence testified, however, that Edward Shine did not maintain a close relationship with her once he left her home, and specifically, he did not tell her about his alleged unlawful conduct. She also credibly testified that she did not make it her business to know all of what was happening in Belle Glade, even when she did live there. She appears to have been fully occupied with her many responsibilities, and it is credible that she paid little attention to the events that were important to Blanc.

Regarding the 2002 incident involving Sandy and Lisa, Ms. Harvey Lawrence credibly testified that when she was reminded of this by the two lawyers, who met with her before the hearing, she did have some recollection of it. Not surprisingly, she did not recall it in the way that Blanc did and certainly not in the detail that he did. She did not think her husband ran after anyone, and she denied calling the police or bringing the girls to the hospital. Although searched for, no police report was found that would prove otherwise, and Blanc has no first-hand knowledge that what Sandy Joseph told him in that regard was true. And, although Sandy Joseph, evidently a former girlfriend of Blanc, did largely corroborate Blanc's memory when Serafini spoke with her, it seems she avoided committing those recollections to a sworn declaration.

Blanc's counsel also argued that Ms. Harvey Lawrence's statement to the Court that she had four children was not truthful because she made no reference to the other children she had cared for, and whom she called her "kids." The suggestion is that she deliberately avoided disclosing her niece Lisa, and foster son Edward, because to have done so would have alerted Blanc that she was aware of his objectionable behavior. To the contrary, I thought her explanation, that she assumed the Court's inquiry about her children was

directed to her biological children, was quite reasonable. There is no evidence that supports Blanc's assumption that Ms. Harvey Lawrence deliberately deceived the Court in that manner.

Last, as for Blanc's recollection that Ms. Harvey Lawrence worked with her husband when Blanc worked in the fields, she did not think that was so. There was nothing about her testimony in this regard that lacked credibility.

Ms. Harvey Lawrence testified, credibly, that she did not want to be selected for the jury, as it would complicate her caring for her mother. The notion that she, at that time, remembered these incidents that involved Blanc, and deliberately did not disclose them makes no sense, as this disclosure would have surely led to her being excused from the jury panel.

Blanc's assumption that Ms. Harvey Lawrence would have known of, and recalled, the events he testified to, was not borne out by the evidence.

### 2. Blanc Did Not Show that Ms. Harvey Lawrence was Actually Biased Against Him

For the reasons already given, the evidence did not suggest, in any measure, that Ms. Harvey Lawrence was biased against Blanc when she sat on his jury.  To the contrary, Ms. Harvey Lawrence revealed that she was the only juror who doubted Blanc's guilt on the conspiracy charge, and she insisted that her fellow jurors persuade her of that evidence of guilt.

While a motion for a new trial is focused on the truthfulness of the juror's answers during *voir dire*, evidence of how this juror conducted herself during deliberations directly

addresses whether she, in fact, held a bias or prejudice against Blanc. Ms. Harvey Lawrence testified credibly that at no point during her service on the jury, did she realize she knew Blanc better than she had recalled during jury selection. Simply put, the record evidence fully supports the conclusion that she served as an impartial juror.

### C.   Blanc Fails to Satisfy the *Strickland* Standard

As explained above, Blanc has entirely failed to show that Ms. Harvey Lawrence did not honestly answer the Court's questions during *voir dire* and that she was prejudiced against Blanc when she served on his jury. Blanc has thus failed to establish the essential prejudice element of the *Strickland v. Washington* standard. It requires that Blanc demonstrate that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. The evidence does not support this conclusion. Therefore, Blanc's claim that his counsel was ineffective for failing to investigate Ms. Harvey Lawrence should be denied.

Although not necessary, for the sake of completeness I briefly address the *Strickland* performance element. Blanc did not present a preponderance of the evidence that Richard Serafini's performance, post-trial, fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-8 *Streeter*, 335 F. App'x at 863. Blanc testified that Serafini did not investigate, at all, the information Blanc shared with him after the trial about Ms. Harvey Lawrence, and that Mr. Serafini did not advise Blanc that he had looked into Blanc's concerns about that juror. Blanc was incorrect about this. Serafini had notes of six post-trial meetings he had with Blanc, and of his telephone calls with Sandy Joseph and

Franchette Mila. He had the result of the investigator's search for any police reports Ms. Harvey Lawrence may have filed, and records of his ordering the *voir dire* transcript. He testified credibly that he discussed with Blanc his thoughts that once he received the *voir dire* transcript, he would either file a motion for a new trial, or file a sealed *ex parte* motion for more CJA funding for the investigator. At that point Blanc asked Judge Hurley to terminate Serafini as counsel, which of course prevented Serafini from following through on those plans.

"In order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Fugate*, 261 F.3d at 1217 (quotation marks and citation omitted). Courts must apply a "strong presumption" that an attorney's conduct falls within a "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. The steps Serafini took to investigate possible juror misconduct were highly reasonable, and it cannot be said that his conduct fell below the performance that all competent counsel would take.

In his briefing Blanc was not clear whether his challenge was directed at just Serafini, or also was also directed at Richard Rosenbaum. Rosenbaum was briefly counsel before this Court, and to thoroughly address the performance element of Blanc's rather broadly stated claim of ineffective assistance of trial counsel, the Court would need to consider Rosenbaum's performance. At the hearing, government counsel reported that Mr. Rosenbaum was unavailable as a witness because he was in trial, and the government proffered a declaration from Mr. Rosenbaum. (ECF No. 33-1). I did not take that declaration into evidence. At the close of the hearing I advised counsel and Blanc that I

thought Blanc had failed to establish the prejudice element of *Strickland* and for that reason, the Court need not consider if Blanc had satisfied the performance element. I further advised that if the Court were to reach the issue of Rosenbaum's performance, that it would want to hear from him directly, as a witness. For the reasons given here, I do not believe that is necessary.

## IV.    Recommendation

For the forgoing reasons, I **RECOMMEND** that the Court **DENY** Blanc's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, [DE 1].

## V.    Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Cecilia M. Altonaga, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b), 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED in chambers at Miami, Florida, this 4th day of May, 2020.

CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE

cc:    The Honorable Cecilia M. Altonaga
         Counsel of record

29